UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| VANESSA WRIGHT,<br><br>        Plaintiff,<br><br>   v.<br><br>USAA SAVINGS BANK; USAA FEDERAL SAVINGS BANK,<br><br>        Defendants. | No. 2:19-cv-00591 WBS CKD<br><br>MEMORANDUM AND ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT |

----oo0oo----

        Charles Wright filed this action against defendants USAA Savings Bank ("USAA SB") and USAA Federal Savings Bank ("USAA FSB") alleging that defendants auto-dialed calls to plaintiff's cellphone without his consent in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, et seq., and the Rosenthal Fair Debt Collection Practices Act ("Rosenthal Act"), Cal. Civ. Code § 1788, et seq.  Before the court are the parties' cross-motions for summary judgment. (Docket Nos. 36 & 37.)

1

I.   Factual Background

Mr. Wright applied for, and was approved for, at least one credit card with USAA Savings Bank. (Defs.' Resp. to Pl.'s Statement of Undisputed Facts ("SUF") at 1:6-10 (Docket No. 44-1).) In Mr. Wright's application for the credit card account, he listed his cellular telephone number. (Id. at 1:11-13.) In 2018, Mr. Wright developed terminal cancer. (Id. at 1:14.) Mr. Wright's wife, Vanessa Wright, quit her full-time job to care for Mr. Wright. (Id. at 1:14-15.) As a result, neither Mr. Wright nor Ms. Wright could make further payments on the USAA Savings Bank credit card account. (Id. at 1:15-17.)

From July 16, 2018 through January 30, 2019, USAA FSB, the servicer of the USAA SB account, called the number Mr. Wright provided in his application in an attempt to contact Mr. Wright regarding the account. (Pls.' Resp. to Defs.' SUF ¶ 22.) To contact Mr. Wright, USAA FSB used the Aspect Dialing System. (Id. ¶ 23.) The Aspect Dialing System is a predictive dialer that does not have, and is not capable of using, a random or sequential number generator for dialing telephone numbers to be called. (Id.; Dep. of Michelle Deneen at 44:12-25 (Docket No. 36-1).)

In response to those calls, plaintiff sought legal representation to address the financial issues facing his household. (Defs.' Resp. to Pl.'s SUF at 1:19-21.) Plaintiff's counsel prepared a letter of representation and of revocation of consent to call Mr. Wright. (Id. at 1:22-24.) Counsel then mailed the letter to USAA SB's headquarters at 3773 Howard Hughes Parkway, Suite 190N, Las Vegas, NV 89169 ("Las Vegas address").

(Docket No. 36-1.)

USAA SB and USAA FSB, however, never provided the Las Vegas address as an address to send account correspondence. (Pl.'s Resp. to Defs.' SUF ¶¶ 12, 16.)  Instead, after Mr. Wright opened the account, and every month for the next 18 years, USAA FSB sent Mr. Wright an account statement with 10750 McDermott Fwy, San Antonio, Texas 78288 ("San Antonio address") as the return address.  (Id. ¶¶ 8-9.)  Every statement—over 200 in total—was from, and contained, this address.  (Id. ¶ 9).  Every statement also listed the San Antonio address for making account payments.  (Id. ¶ 10.)  After Mr. Wright's account became delinquent, and in addition to the monthly statements, USAA FSB began to send payment reminders to Mr. Wright.  (Id. ¶ 14.)  Like the monthly statements, every payment reminder contained the San Antonio address as the return address.  (Id. ¶ 15.)

Further, both the monthly statements and the payment reminder letters referred Mr. Wright to USAA's website, USAA.com, for additional information regarding his account.  (Decl. of Michelle Deneen ("Deenan Decl") ¶ 20 (Docket No. 39-1); Defs.' Mot. Summ. J., Exs. A-2, A-3 (Docket Nos. 39-3, 39-4).)  USAA's website contains a "Contact Us" page, with specific mailing addresses for its various business lines, including its bank. (Deneen Decl. ¶ 21.)  The website listed USAA Federal Savings Bank's mailing address as the San Antonio address and did not list the Las Vegas address anywhere on the website.  (Deneen Decl. ¶¶ 23-24; Defs.' Mot. Summ. J., Ex. A-4 (Docket No. 39-5); Pl.'s Resp. to Defs.' SUF ¶ 20.)

Although there is no evidence that USAA provides the

3

Las Vegas address to any of its members for sending account correspondence, USAA SB does receive mail at its Las Vegas headquarters.  (Pl.'s Resp. to Defs.' SUF ¶ 21.)  The Las Vegas address, however, is a large corporate office building at which USAA SB is only one tenant.  (Id. ¶ 25.)  Only five to six employees work for USAA SB at that address.  (Id. ¶ 26.)  The Las Vegas address has a front desk not owned or controlled by USAA SB.  (Id. ¶ 30.)  Because USAA SB does not sign for, and cannot control the receipt of, correspondence at the Las Vegas address, USAA SB never provides the Las Vegas address to its members for purposes of sending account correspondence.  (Id. ¶ 32.)

In the event that correspondence does reach USAA SB at the Las Vegas address, the correspondence is transmitted to USAA FSB's headquarters at the San Antonio address.  (Id. ¶ 28.)  Such an event is infrequent, however, because USAA SB receives approximately only six pieces of mail per month at the Las Vegas address.  (Id.)  By contrast, USAA FSB receives approximately 1.8 million pieces of mail per month at the San Antonio address.  (Id. ¶ 29.)

Mr. Wright's October 2018 letter was sent via certified mail and the USPS confirmation notice associated with the letter verifies that the letter was "delivered to the front desk, reception area, or mail room . . . in LAS VEGAS NV 89169." (Pl.'s Mot. Summ. J., Ex. D at 1 (Docket No. 36-3).)  Defendants contend that they did not sign for any certified mail and that they have no record of ever receiving the letter.  (Pl.'s Resp. to Defs.' SUF ¶¶ 33-34.)  Accordingly, the notice of revocation of consent to call Mr. Wright was not processed or otherwise

4

applied to Mr. Wright's account.  (Id. ¶ 34.)

After defendants continued calling, plaintiff filed this suit alleging the following causes of action: (1) violation of the Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code §1788, et seq.; and (2) violation of the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227, et seq.  (First Amended Complaint (Docket No. 16).)  Mr. Wright passed shortly after filing suit, and this court granted Ms. Wright's motion to substitute plaintiff.  (Docket No. 24).

II. Telephone Consumer Protection Act Claim (Count Two)

"[T]he TCPA forbids calls placed using an automated telephone dialing system [("ATDS")]" without "the prior express consent of the called party."  Duguid v. Facebook, Inc., 926 F.3d 1146, 1149 (9th Cir. 2019) (quoting 47 U.S.C. § 227(b)(1)(A)).  A defendant's "willful and knowing" violation of the statute entitles a plaintiff to treble damages.  47 U.S.C. § (b)(3).  Plaintiff argues that defendants called plaintiff without his consent because plaintiff revoked his consent via the October 2018 letter, and that because defendants were on notice that the communication was unsolicited plaintiff is entitled to treble damages.  Defendants on the other hand argue that the device used to contact plaintiff does not constitute an ATDS under the statute and that, even if it does, plaintiff did not effectively revoke consent to be called.

    A. Whether the Aspect Dialing System Is An ATDS

Since the enactment of the TCPA in 1991, the definition of ATDS has remained the same: "equipment which has the capacity —-(A) to store or produce telephone numbers to be called, using a

random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1); Marks v. Crunch San Diego, LLC, 904 F.3d 1041, 1044-45 (9th Cir. 2018).

Between 2003 and 2015, the Federal Communications Commission ("FCC") issued a series of rulings to determine whether predictive dialers, such as the Aspect Dialing System, which do not "dial[] a random or sequential block of numbers," but rather "automatically dial[] a list of numbers that had been preprogrammed and stored in the dialer" constitute automated telephone dialing systems under the statute. Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 18 FCC Rcd. 14,014, 14,017, 14,022 (2003) ("2003 Order"); Marks, 904 F.3d at 1045.

In its 2012 Order, the FCC reasoned that the statutory definition of ATDS "covers any equipment that has the specified capacity to generate numbers and dial them without human intervention regardless of whether the numbers called are randomly or sequentially generated or come from calling lists." Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 27 FCC Rcd. 15,391, 15,392 n.5 (2012). In 2015, however, the FCC endorsed the opposite view that a device "would not meet the definition of an ATDS unless it had the capacity to dial random or sequential numbers." Marks, 904 F.3d at 1046 (citing Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 30 FCC Rcd. 7691, 7971-72 (2015) ("2015 Declaratory Ruling")).

In response to the uncertainty following the FCC's 2015 Declaratory Ruling, "a large number of regulated entities

6

1 challenged the FCC's definition of an ATDS." Marks, 904 F.3d at
2 1046. The petitions were consolidated in the D.C. Circuit. See
3 Consolidated Order, ACA Int'l v. FCC, 885 F.3d 687 (D.C. Cir.
4 2018). Concluding that the FCC cannot, "consistent with reasoned
5 decision-making, espouse both competing interpretations [of ATDS]
6 in the same order," the court "set aside the Commission's
7 treatment of those matters." Id. at 703.
8      After the D.C. Circuit issued its opinion in ACA
9 International, the Ninth Circuit addressed the definition of ATDS
10 in Marks v. Crunch San Diego, LLC, 904 F.3d 1041 (9th Cir. 2018).
11 After establishing that "the FCC's prior orders on [the
12 definition of ATDS] are no longer binding," the Marks court
13 concluded that "the statutory definition of ATDS is not limited
14 to devices with the capacity to call numbers produced by a
15 'random or sequential number generator,' but also includes
16 devices with the capacity to dial stored numbers automatically."
17 Id. at 1049-50.
18      Because under Marks a device that has the capacity to
19 "store numbers to be called . . . and to dial such numbers" is an
20 ATDS, id., and because it is undisputed that the Aspect Dialing
21 System calls, without human intervention, a list of stored phone
22 numbers identified by USAA's loss mitigation algorithm (Deneen
23 Decl. at 43:6-23, 44:19-25), defendants' Aspect Dialing System is
24 an ATDS.
25      Defendants argue that the Ninth Circuit's decision in
26 Marks is not controlling. Specifically, defendants contend that
27 the D.C. Circuit's decision in ACA International invalidated only
28 the FCC's 2003, 2012, and 2015 Orders. (Defs.' Mot. Summ. J. at

10.)  As a result, the FCC's 1992 and 1995 Orders, which conclude that to be an ATDS the system must itself generate numbers "in a random or sequential fashion," control here.  In Re Rules & Regulations Implementing the TCPA of 1991, 7 F.C.C. Rcd. 8752, 8769 ¶ 47 (1992) ("1992 Order"); see In Re Rules and Regulations Implementing the TCPA of 1991, 10 FCC Rcd. 12391, ¶ 19 (1995) ("1995 Order").  Because the Aspect Dialing System does not generate numbers randomly or sequentially, defendants contend that the system at issue is not an ATDS under the statute.

This court is bound by Marks.  Defendants' proposition to the contrary is unpersuasive.  First, the FCC did not consider the question of whether an autodialer constituted an ATDS under the TCPA until 2003.  See 2003 Order ¶ 130; Marks, 904 F.3d at 1045 (describing how growing FCC concern with autodialers "warranted modifications to the existing rules" in 2003).  Assuming defendants' contention that every FCC order prior to 2003 still stands is correct, no FCC guidance on autodialers would bind this court.

Second, defendants' interpretation of ACA International is incorrect.  The D.C. Circuit did not discretely vacate just the FCC's 2003, 2012, and 2015 orders.  Instead, the ACA International court broadly "invalidated the FCC's interpretation of the two key questions raised by the statutory definition of an ATDS, namely: '(i) when does a device have the "capacity" to perform the two enumerated functions; and (ii) what precisely are those functions?'"  Marks, 904 F. 3d at 1047 (citing ACA Int'l, 885 F.3d at 695).  Notably, the ACA International court made no reference to the 1992 and 1995 Orders and their continuing

1   validity.  Because the D.C. Circuit "set aside the Commission's
2   treatment" of what "functions a device must perform to qualify as
3   an autodialer," ACA Int'l, 885 F.3d at 703, defendants'
4   proposition that the ACA International court left in place any
5   FCC orders describing those functions is untenable.
6          Third, the Ninth Circuit's subsequent decision in
7   Duguid v. Facebook, Inc., 926 F.3d 1146 (9th Cir. 2019),
8   "confirms that Marks is the law" in this circuit.  Lamkin v.
9   Portfolio Recovery Assocs., LLC, No. 2:18-CV-03071-WBS-KJN, 2019
10  WL 4670829, at *4 (E.D. Cal. Sept. 25, 2019).  The Duguid court
11  reiterated that ACA International "wipe[d] the definitional slate
12  clean," requiring the Ninth Circuit to "beg[in] anew to consider
13  the definition of ATDS under the TCPA."  Id. at 1150 (quoting
14  Marks, 904 F.3d at 1041).  The Marks court "clarif[ied] any
15  ambiguity" regarding what functions an ATDS must have and "[t]hat
16  definition governs."  Id.
17         Accordingly, because under Marks a device that has the
18  capacity to "store numbers to be called . . . and to dial such
19  numbers" is an ATDS, 904 F.3d at 1052, and because it is
20  undisputed that the Aspect Dialing System calls stored phone
21  numbers, this court finds that defendants' Aspect Dialing System
22  is an ATDS.
23     B. Whether Mr. Wright Effectively Revoked His Consent
24         Under the TCPA, "consumers may revoke consent through
25  any reasonable means," "using any reasonable method including
26  orally or in writing."  2015 FCC Order, ¶¶ 55, 64.  "A caller may
27  not limit the manner in which revocation may occur."  Id. ¶ 47.
28  When assessing whether a particular means of revocation used by a

1    consumer was reasonable, courts look to the "totality of the
2    facts and circumstances surrounding that specific situation,
3    including, for example, whether the consumer had a reasonable
4    expectation that he or she could effectively communicate his or
5    her request for revocation to the caller in that circumstance,
6    and whether the caller could have implemented mechanisms to
7    effectuate a requested revocation without incurring undue
8    burdens."  2015 Order ¶ 64 n.233; ACA Int'l, 885 F.3d at 709 ("In
9    assessing whether a revocation request meets the 'reasonable
10   means' standard, the Commission said it would consider 'the
11   totality of the facts and circumstances.'"); Silver v.
12   Pennsylvania Higher Educ. Assistance Agency, No. 14-CV-00652-PJH,
13   2020 WL 607054, at *16 (N.D. Cal. Feb. 7, 2020).

14          Under the facts presented here, no reasonable trier of
15   fact could find that plaintiff used reasonable means to revoke
16   consent. Defendants never made the Las Vegas address known to
17   customers, nor did they communicate to its customers that the Las
18   Vegas address was an appropriate destination for customers'
19   account-related inquiries.[1]  Mr. Wright received over 200
20   statements and monthly payment reminders from the San Antonio
21   address.  (Pl.'s Resp. to Defs.' SUF ¶¶ 9, 15.)  Each of those
22   documents listed the San Antonio address as the correct address
23   for account-related correspondence.  (Id. ¶ 10.)  Further, each
24   of those documents listed USAA's webpage as a resource, which
25   also listed the San Antonio address as the appropriate mailing

---

[1] Although the Las Vegas address is the address of USAA SB headquarters, a cursory Google search for "USAA SB headquarters" still points to the San Antonio address.

1    address.  (Deenan Decl. ¶ 20.)  Given defendants' consistent
2    communications with plaintiff over the course of 18 years, no
3    reasonable juror could find that plaintiff had a reasonable
4    expectation that he could effectively communicate his request to
5    revoke his consent at the Las Vegas address.
6            Moreover, plaintiff cannot establish that defendants
7    received the revocation letter.  Defendants have no record of
8    receiving the notice.  (Id. ¶¶ 33-34.)  The USPS confirmation
9    notice confirms only that the letter was "delivered to the front
10   desk, reception area, or mail room . . . in LAS VEGAS NV 89169."
11   (Pl.'s Mot. Summ. J., Ex. D at 1.)  Not only does the
12   confirmation notice not list the complete address, but also, the
13   notice confirms receipt only by the front desk.  Plaintiff does
14   not dispute that USAA SB does not own or control the front desk,
15   or that USAA SB does not sign for, and cannot control the receipt
16   of, correspondence at the Las Vegas address.  (Pl.'s Resp. to
17   Defs.' SUF ¶¶ 30, 32.)  Indeed, defendants' lack of control over
18   the front desk is one of the reasons USAA SB never provides the
19   Las Vegas address to its members.  (Id. ¶ 32.)  There is
20   accordingly insufficient evidence to support a finding that
21   defendants received the letter.
22           Moreover, based upon the court's colloquy with counsel
23   at oral argument, it clearly appears that the choice to send the
24   letter to Las Vegas arose not from a genuine expectation that
25   defendants would process Las Vegas correspondence, but rather
26   from an attempt by counsel simply to create a record for
27   litigation.  The court notes that it was plaintiff's counsel --
28   not plaintiff -- who chose to mail the letter to the Las Vegas

11

address. With over 90 TCPA cases filed by plaintiff's attorney in the Eastern District of California, he should have known how to effectively contact a lender. Indeed, counsel has filed suit for a violation of the TCPA against USAA SB before. See, e.g., Aycock v. USAA Savings Bank, No. 2:18-cv-00626-JAM-EFB (Filed March 22, 2018). In Aycock, plaintiff's counsel similarly argued that plaintiff had revoked consent to be called via a letter drafted by plaintiff's counsel. (Compl. ¶¶ 19-20 (Case No. 2:18-cv-00626-JAM-EFB, Docket No. 1).) By August 2018, the parties in Aycock had filed a Joint Status Report wherein defendant stated that "Plaintiff did not effectively revoke consent." (Joint Status Report at 1 (Case No. 2:18-cv-00626-JAM-EFB, Docket No. 9).) By the time plaintiff's counsel sent the letter at issue in this case, counsel was on notice that his method of revocation may present some issues and admitted as much during oral argument. It therefore strikes the court as disingenuous for counsel to argue that he sent the letter to Las Vegas to revoke his client's consent, and not simply to set defendant up for this litigation.[2]

Considering that the choice of address appears to be a part of plaintiff counsel's legal strategy and not a regular

---

[2] Plaintiff's counsel argues that defendants constantly hide behind different entities when responding to litigation. (Pl.'s Opp'n at 4.) Specifically, plaintiff argues that when plaintiff sues one of the defendants, the sued defendant will argue that the appropriate party is the other defendant. Even if true, service of process and appropriate revocation of consent are two different issues. Further, plaintiff here sued both defendants, so the tactic plaintiff describes was not at play here. If defendant was unsure of which address was correct, and actually intended the calls to stop, there is no explanation of why counsel would not send a revocation letter to both addresses.

consumer's contact with a lender, and that USAA SB has previously objected to counsel's notice method, the court concludes that a reasonable person, after receiving hundreds of notices pointing to San Antonio, could not have expected to effectively revoke consent by contacting a corporate building in Las Vegas.  Because plaintiff did not effectively revoke his consent, the court will grant defendants' motion for summary judgement.

III. Rosenthal Act Claim (Count One)

To establish a violation of the Rosenthal Act, plaintiff must prove: (1) the plaintiff is a "debtor"; (2) the debt at issue is a "consumer debt"; (3) the defendant is a "debt collector"; and (4) that the defendant violated one of the liability provisions of the Rosenthal Act.  Long v. Nationwide Legal File & Serve, Inc., No. 12-CV-03578, 2013 U.S. Dist. LEXIS 132971, *56-57 (N.D. Cal. Sept. 17, 2013).  Defendants dispute only prong four.

Here, plaintiff alleges that the calls made to Mr. Wright after October 15, 2018 violated Section 1788.14(c) of the Rosenthal Act, which prohibits communicating "with the debtor with regard to the consumer debt, when the debt collector has been previously notified in writing by the debtor's attorney that the debtor is represented by such attorney . . . ."  Cal. Civ. Code § 1788.14(c).  To show that defendants violated Section 1788.14(c), plaintiff must establish that defendants had "actual knowledge" that Mr. Wright was represented by an attorney.  Munoz v. Cal. Bus. Bureau, Inc., No. 1:15-CV-01345-BAM, 2016 WL 6517655, at *8 (E.D. Cal. Nov. 1, 2016).

For the reasons above, the court finds as a matter of

13

law that defendants either did not receive or did not process the letter and therefore did not have actual knowledge that plaintiff was represented by an attorney.  Accordingly, the court will grant defendants' motion for summary judgment on plaintiff's Rosenthal Act claim.

   IT IS THEREFORE ORDERED that defendants' motion for summary judgment (Docket No. 37) be, and the same hereby is, GRANTED.

   IT IS FURTHER ORDERED that plaintiff's motion for summary judgment (Docket No. 36) be, and the same hereby is, DENIED.

Dated:  May 21, 2020

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE